May it please the Court, Isha Anand for Plaintiff Appellant Marcus Mitchell. I'd like to preserve four minutes for rebuttal. At this stage of the proceedings, this Court must accept as true that Mr. Mitchell is part of an entirely peaceful protest, that he was standing with his hands raised, visibly unarmed and praying, that police officers nonetheless fired lead-filled bean-bag rounds at his face, permanently disabling him, and that they did so because he was part of a protest, to use viewpoint they were hostile, and because he had been labeled an agitator, a leader of that protest. Those allegations are sufficient to survive a motion to dismiss, and at the very least, the District Court should have given us an opportunity to move for leave to amend. So there are two pieces of defendant's conduct that we're challenging on appeal, shooting him in the face and arresting him. So let me go through those in turn. So I'll start with the use of force, the shooting in the face. Mr. Mitchell has alleged that violates both the First and the Fourth Amendment. As to the First Amendment, Mr. Mitchell has alleged each of the elements of a retaliatory use of force claim, so protected conduct, adverse action and causation or motive. And if the Blackwater law, that claim doesn't fall just because there's probable cause, that's the Peterson case, and that it isn't Heckfard, that's the Colbert case. As for the Fourth Amendment, this Court has in more than a dozen cases, collected at footnote 10 of our opening brief, articulated the Fourth Amendment rule that it is clearly established that police may not use more than de minimis force against a nonviolent, nonthreatening, suspected misdemeanant, precisely the rule that Mr. Mitchell alleges was violated here. So those are the kind of core claims regarding the shooting. The other police conduct that Mr. Mitchell challenges is the arrest. And we've alleged that defendants arrested him in violation of his First Amendment rights because it was in retaliation for protected speech. Now, hanging over all of this is defendants' invocation of the Heck bar. We've explained that that bar doesn't apply for at least three reasons, any one of which would be sufficient to mean that the Heck bar doesn't apply to these claims. So first, there was no conviction or sentence. A pretrial diversion agreement under North Dakota law isn't a conviction. In fact, as the Tenth Circuit put it, discussing an equivalent Kansas law, it's the opposite of a conviction. It doesn't require proof of guilt or admission of guilt. Second, even if there had been a conviction or sentence here, Heck only kicks in if success on the 1983 suit would, quote, necessarily imply the invalidity of any such conviction. That's not the case here. And that's particularly evident on Mr. Mitchell's use of force claims. Again, that's Colbert v. City of Monticello makes clear that success on an excessive force claim doesn't necessarily imply the invalidity of a conviction. And third, a pretrial diversion agreement is an end to the criminal proceeding that's not, quote, inconsistent with innocence, since there's no requirement that anyone prove or admit guilt. And as Judge Pryor explained in Laskar v. Heard, and as the Second Circuit recently held in Smalls v. Collins, the subject of our 28-J letter, that's enough for the favorable termination requirement, which again means Heck doesn't apply. Defendants argue that there's no First Amendment problem here because Mr. Mitchell was trespassing. To the extent they're suggesting that probable cause for the misdemeanor voids protected conduct under the First Amendment, that's just not true. We know that from cases like Peterson, where there's undoubtedly probable cause to believe someone was trespassing. But what is pled that they were motivated by his exercising of his First Amendment rights versus being motivated by the alleged trespass? Sure, Your Honor. So I'll be clear. Peterson indicates that this is typically a jury question. And so at this point, joint all inferences are in our favor. We've pled first that the tactics that were being used were not, quote, typical crowd-control tactics. That's at paragraph 39. Second, that he was shot upon speaking the words mini-Wachoni. The kind of Lakota for water is life, and as this Court explained in Peterson, kind of temporal proximity is circumstantial evidence. Third, he's alleged he can produce law enforcement records discussing a plan to single out, quote, unquote, agitators for particular punishment to end the protest. That's at paragraph 52. Fourth, he's alleged there's no other reason to shoot at him, right? He's standing 20 feet away from officers. He's not moving. He's got his hands in the air to show he's unarmed. He's peacefully praying. That's at paragraphs 51 and 53 to 55. And this Court has explained in a number of contexts that if there's no sort of valid reason for government conduct, that's at least circumstantial evidence of an invalid reason. And fifth, you know, the fact that after he's arrested, he's interrogated about the water protector movement. He's interrogated about the protesters' plans. You know, all while sort of shackled to a hospital bed. Gives rise to at least an inference that his involvement in that movement was a sort of substantial motivating factor in the way that officers treated him. That's at paragraph 64. What's alleged as to why the bridge was a First Amendment forum or a place where there would be an ability for the public to protest? Sure, Your Honor. Viewed as a forum, some classification of forum for First Amendment purposes. Sure, Your Honor. So I just want to be clear that first, our complaint hasn't alleged that the bridge was closed off at all. It alleges it was closed off to vehicular traffic, but actually most of it was open to foot traffic. And second, even if this wouldn't give police officers the right to use force in retaliation for someone's First Amendment rights, that's sort of Peterson where it's clear someone can be removed, but it's police officers still have to be mindful of the First Amendment rights of the person they're removing. So you do not allege that the bridge is a, either a public forum or a limited public forum? So apologies, Your Honor. I wanted to just make clear that we wouldn't sort of, regardless of the validity of the closure. But as to the, as to the bridge itself, we've alleged multiple times that it was a public highway, that it was used for a variety of expressive purposes. And it's sort of beyond dispute. It's been true for a We understand a public, it's a public highway, but in terms of our evaluation of a First Amendment argument, one of the first issues to address is whether the speech is taking place in a protected forum or a forum for free speech, whether it be a public forum or a limited public forum or, or some other variety that, for which there's legal analysis. Sure, Your Honor. That's correct. So because for 80 years the Supreme Court has held that all public roads are public forum, right? Whenever there's a new public forum, the question is how similar is this to a road? And in fact, in Frisbee, this Court said you can't sort of try to pick and choose among public roads. It's all public roads are held in immemorial trust for public expression. So we think it's really clear this was a public forum, which means that it's the defendant's burden to put forth some sort of reason why the bridge is validly closed off. Now, again, as to our retaliation claims, it is the case that even if for some reason this were not a public forum, even if it were validly closed off for some reason, we'd be squarely within Peterson, which says you still cannot use more force than you would have otherwise because you are upset about the content of somebody's speech. So again, even if, you know, the bridge is structurally unsound and that's the reason it's closed off, police officers still can't say, well, we're going, we could just get you off the bridge with pepper spray, we're going to shoot you because we don't like the content of your protest. But here, your friend would suggest that that's not what happened, right, and that in fact it was more like a Bernini situation where they were trying to disperse a crowd that was trespassing in violation of the law. How would you respond to that? So I want to be clear that defendants haven't invoked Bernini and couldn't invoke Bernini as to our First Amendment use of force claim. The Bernini plaintiffs didn't have a retaliatory use of force claim. So there's no kind of qualified immunity for our First Amendment claim about the use of force. As for our Fourth Amendment claim about the use of force, defendants have invoked Bernini to suggest that there's qualified immunity. But Bernini wasn't, Bernini's not the relevant case here, and that's because there's sort of two lines of cases in this Court's precedent about large crowds, right? The first is cases like Johnson, which features a, quote, a very hostile crowd loudly protesting police, or Smalls, which features a raucous party, but where police officers are using force against particular people to subdue them. The second is the case like Bernini, which as this Court points out, it's about moving a crowd. Police officers aren't using force against any particular people. The Court in Bernini points out three separate times, right? No particular person is being targeted. In fact, some plaintiffs in Bernini allege they were directly targeted. They were peppered. But does the record indicate here whether anyone else was hit with these beanbags? So, Your Honor, the record doesn't indicate in this case whether others were hit. But to the extent that police officers were aiming at particular people to subdue them, right, so not to move them, right, it's not tear gas to make the bridge unpleasant to incentivize people to move. It's shooting people in the face to subdue them. This is a categorically different situation than Bernini, where, again, you know, the one plaintiff who said, well, I was pepper sprayed in the face, the Court didn't say, well, that's part of crowd control, so it's okay under our Fourth Amendment analysis. The Court said you lose because you couldn't say this defendant pepper sprayed you in the face. So we submit we're sort of in the line of cases like Johnson and Smalls, where, yes, there's a crowd, but because police officers are targeting individuals, the question is whether it's a sort of nonthreatening, nonviolent suspected misdemeanant. And, again, all of this goes only to the Fourth Amendment claim. As to the First Amendment retaliatory use of force claim, it's pretty clear that Bernini has nothing to say on that subject. And I should be clear, Your Honor, if you conclude that, heck, it does not bar our claims, but you think there is some missing allegation regarding motive, we submit there isn't. I just presented you with a bunch of pieces of evidence, drawing all inferences in our favor at this preliminary stage. We think this is enough to get past a motion to dismiss. But if, Your Honor, to conclude that, heck, it doesn't bar our claim, but that you'd want to see more evidence regarding retaliatory motive, the correct answer here is to remand for the district court to entertain a motion for a leave to amend, since we didn't have the chance to move for a leave to amend, because the district court dismissed with prejudice and entered judgment on the same day. And I see that I'm in my rebuttal time, so if Your Honors don't have questions, I'll save the rest of my time. All right. Thank you, Ms. Anand. Mr. Grinnells? Mr. Chief Justice, Justices of the Court, my name is Sean Grinnells. We're judges. Don't elevate us yet. Justice of the Court, my name is Sean Grinnells. I'm here representing the city and county defendants appellees in this case, Morton County, Morton County Sheriff Kyle Kirchmeier, Morton County Deputy Sheriff George Peel, the City of Bismarck, and Bismarck Police Officer Tyler Welk. So I think what's important in this case is to focus in on what Mr. Mitchell has admitted in his pleadings. There's several critical admissions that he's made. First, he admits that there were ongoing confrontations between law enforcement and the protesters against the Dakota Access Pipeline project had been going on for a considerable amount of time before the events at issue here in this case, which happened on January 18th to the 19th of 2017. He admits that at least as early as October of 2016, there had been confrontations involving use of force by officers in the vicinity of and on the Backwater Bridge, trying to remove protesters from the Backwater Bridge. He admits that on the night in question, January 18th, that the reason he came to the bridge is he had heard reports that officers were shooting at protesters. And he says that when he came to the bridge, he actually observed law enforcement using less lethal munitions and engaging in pushes against the interjected himself and placed himself between the protesters and the police line, whereupon he is struck by the beanbag rounds. Now, he has admitted in his pleadings that Highway 1806, which crosses over the Backwater Bridge dislocation, had been closed to traffic from Fort Rice, which is north of the bridge to Fort Yates, which is south of the bridge. And he admits that law enforcement had been enforcing a prohibition on foot traffic, horse traffic, ATVs for a nine mile stretch of this vicinity. So not even foot traffic was permitted. Correct. Those are his allegations. Now, so we have a situation where Mr. Mitchell, having observed all of this force being applied against protesters, having observed that the force is being utilized by law enforcement to remove protesters from the bridge, asserting he, essentially asserting he didn't know he wasn't supposed to be on the bridge. Well, our position is that just those affirmative admissions on his part establishes that there were warnings given to get off the bridge. He doesn't admit there were verbal warnings given, but just the fact that he's observing the force being applied in of itself is a warning to remove yourself from the bridge. Let me ask you though, does that really matter? I mean, at most, what you've established is he's a trespasser. Fairly, you know, relatively mild misdemeanor, right? He's not threatening anybody. He's not violent. He's standing his ground maybe, but he's not violent. Don't our cases say that at most you can use de minimis force? And is this beanbag shot at his face de minimis force? Two points in that, Your Honor. First, with respect to the shooting the beanbag round at his face, we've discussed in our briefing that he has alleged that the officer shot at him, but our position is his pleadings don't allege that the officer's intentionally tried to shoot him in the face. So one of our arguments is that the court has previously stated that negligent or gross negligence doesn't support a section 1983 claim. And so our argument is that he hasn't actually pled an intentional application of force to shoot him in the head, perhaps an intentional application of force to strike him somewhere, but not to cause the injury alleged in this case, which we admit was an unfortunate, was not intentional to shoot him in the face. I think your opponent characterized their pleading in that way, but you're saying that's not the actual language of the complaint. Correct. The complaint itself alleges that the officers directed their fire at him. And then the complaint goes on to allege that he was struck in the face and struck in the eye. It doesn't necessarily make the correlating link that it was intentionally struck in the face. So aside from that, your question about is it's a misdemeanor. We believe this case is squarely, false squarely within the Bernini case of Bernini versus City of St. Paul. And in that case, as the justices are aware, that involved the 2008 Republican National Convention in downtown St. Paul. There were ongoing protests against that, that it resulted in violence and in destruction of property, the downtown area. The senior law enforcement officer decided to close the downtown area and barricaded the downtown area to make it basically a no-go area. And despite doing that, protesters continued to try to access the secured area downtown. And despite the officer saying, get back, get back, protesters still came forward. Was there any targeting of individuals in that case? Well, in that case, the decision references that the officers utilize stinger ball grenades, which would have been targeted at a group of people. I admit it'd be a group of people, but it'd be targeting the people who are directly in front of you as well as gas and smoke. So there were less lethal munitions being utilized. And in that particular case, the court did note that they believed that it was objectively reasonable to utilize less lethal munitions for the purpose of preventing people from accessing a secured area for purposes of crowd control. And in response to the plaintiff's allegation in that case that it wasn't objectively reasonable because they were complying with law enforcement commands by walking away as directed by law enforcement, the court noted, well, some of the protesters turned around to face law enforcement and so therefore it was objectively reasonable to continue to use force to direct the crowd towards what protesters were being screened for purposes of arrests. And so in our situation, we're asserting that that is very substantially similar to our particular situation where you have all these protesters. He admits in his pleading that the officers were engaged in pushes trying to get these people off the bridge. He admits that for months, these protesters have been trying to access the bridge and there have been confrontations with law enforcement trying to prevent them from traveling on Highway 1806 and protesters were basically just defying law enforcement's commands and just defying law enforcement. The other thing I want to point out is that the fact that he observed the pushes being done and the application of force to the other protesters on the bridge before he got there establishes that there had, even before he got there, there had been an escalation of force to the point where officers had to utilize less lethal munitions in attempts to remove those protesters and to gain their So that when he got onto the bridge, it's not a situation where we have to start all over from square one, that we have to start all over and say, please, sir, get off the bridge. It's already been the escalation and he's part of a unit. This side, in the Bernini case, the court noted that where the crowd, where the officers reasonably believed that the crowd is acting as a unit, that it's appropriate for law enforcement to apply the probable cause determination and to single out the individuals within a large crowd if the crowd is acting together as a unit. And that's this situation squarely. I mean, he alleges in his complaint, there were over 200 protesters on that bridge that night that the law enforcement were trying to remove. The other- Counsel, will you address the Heck bar issue? Because it seems here where you have a diversion that results in no conviction, that there's a very important question as to whether Heck even applies. Sure, Your Honor. So this court has previously recognized in the NUME decision and the NC decision that there's a conflict between the circuits as to the interpretation of the Heck bar. Some circuits interpreted as saying it only applies in the context of someone who's in custody in the context of habeas purposes, and several circuits follow that and say you have to have a conviction before it even applies. This circuit has followed the other track with other circuits that have said that no, the underlying principle in Heck is the judicial principle of preventing collateral attacks. Well, what collateral attack could take place here where there is no judgment to be attacked? True. There is no judgment. So what we have here is a pretrial diversion agreement under North Dakota's criminal rule 32.2. And under North Dakota law, every single pretrial diversion agreement has as a that the person is subject to essentially probation that they cannot commit another crime for a specified period of time. Now, in this case, the district judge took judicial notice of the underlying criminal charges against Mr. Mitchell in this case. Well, how is that consistent with resolving things in favor of the plaintiff here at this juncture? I mean, it may be further development could come forth and there's evidence to with innocence. But at this point, it seems a bit troubling for a court to make decisions in the absence of evidence. So, Your Honor, one thing I'll point out in this case, he does admit in his complaint that a warrant was issued for his arrest on the charges of criminal trespass and physical obstruction of a government function. That necessary... What case stands for the proposition that a criminal charge is sufficient to trigger Heck? I mean, that's what the district court says here. A 1983 plaintiff must have achieved a favorable termination of a prior criminal charge. Court then cites Neumey, which doesn't say that. True. But the court also cites the Third Circuit case of Gillis v. Davis from 2005, as well as the Roche v. Autorola case from the Second Circuit. And just to illustrate, the Gillis court basically said that a claim where the plaintiff had completed Pennsylvania's accelerated rehabilitation program and had the underlying disorderly conduct charge dismissed against him pursuant to that resulted in his claim, First Amendment claim, being Heck barred, concluding that to require answering the same question, whether the plaintiff's conduct was protected conduct or whether it was criminal conduct, it results in answering the exact same question. I see my time has expired, Your Honors. I don't see any additional questions. Thank you. Thank you very much, Mr. Grunov. Good morning, Your Honors. May it please the court, counsel. My name is Jim Nicolai and I represent State Defendant Kennelly in this case. And our principal argument is that the factual allegation that Sergeant Kennelly was the scene commander coupled with a formulaic recitation of the elements of a failure to intervene does not satisfy Iqbal and Twomley principles. I'll stand on my briefing on that issue, unless the court has any questions. I'd like to focus on three arguments that were made in Mitchell's reply brief. The first is that Mitchell plucks out of context two statements from Nance versus Samus about an officer who participated in a tactical decision and failed to take a failure to intervene theory. But as this court knows, factual context matters in Fourth Amendment cases and the facts of Nance v. Samus stand in stark contrast to the facts of this case. In Nance, you have what's referred to as participating in a tactical decision is officers who chose to confront two teens after dark in a poorly lit parking lot. Under the plaintiff's version of the facts, the officers gave no warning that they were police officers and they gave no warning about the possible use of deadly force. And I think that's what Judge Murphy was referring to as the failure to take action to de-escalate the situation is not to warn. In this case, we have a situation where Mitchell was clearly aware of the police presence, he admits that, that's at 820 paragraph 48 of the complaint, he admits that he voluntarily approached the bridge, he admits that police gave a warning in the fact that they gave, he says in paragraph 54 of the complaint, that there was a countdown, he knew they were already engaging in non-lethal force. And the other important difference is that Nance involved deadly force, this involves non-lethal force. And this court has, at least on two occasions since distinguishing Nance, recognizing that factual context is important in amendment cases, excessive force cases, that's in Robinson versus Payton and Boudon versus Harsin. Secondly, I'd like to address the attempt to distinguish Bernini on the grounds that Bernini did not involve a failure to intervene claim. That does not work in the plaintiff's favor because a failure to intervene claim is a derivative of a substantive violation. So if the scene commander was not liable for directly participating in the force in Bernini, then it stands to ground that, as Sergeant Kennelly as a scene commander here, wouldn't be liable on a derivative claim that depends upon an underlying constitutional violation. And then third, I'd like to address the, the, their reliance upon McAles versus Nebraska to argue that the abandoned claim should have been dismissed without prejudice rather than with prejudice. I see my time is up. Can I briefly address that issue? You can complete your thought. So like McAles, or McAles, like Bergstrom, the case they relied upon in their original brief, involved a situation where a district court was choosing between the level of sanction to apply for repeated violations of court orders and court rules, whether to dismiss with prejudice or without prejudice. That's not the situation we have here, which involves the substantive question of whether a Rule 12b-6 dismissal is an adjudication on the merits. And this case also involves a situation where in response to the motion to dismiss, as numerous cases that we cite in our brief establish, Mr. Mitchell could have amended his complaint as a matter of right within 21 days, could have moved to amend, lodging a complaint as required by local rules. And even on appeal now has still not explained how an amended complaint would fix the Iqbal-Toomblee problems in the claim that's brought against Sergeant Kennelly. We'd ask for you to affirm the district court. Thank you. Thank you, Mr. Nicolai. Your Honors, I'd like to respond to three arguments I heard in a long time regarding being Belarus in exclusion. First, on the road closure issue, Mr. judge Napoleon asked the district court to report to Mr.  complaints and complaints were projected to be more reliable. And this was rooted in declined reputations of mission and duty safety by the federal government.  This issue of the road closure. And it's contrary to the notion in our pleadings that the backwater bridge, as we explain at paragraph 25 is a public road, the quintessential public forum per Supreme court cases over the last 80 years. Second, I want to respond to this notion that the pretrial diversion agreement triggers the heck bar judge Cobas. As you noted, a criminal charge cannot trigger the heck bar that's Wallace versus Cato where a probable cause hearing and arraignment and indictment, even the certainty of a conviction enough, it's the actual conviction that triggers the heck bar and neither the third circuit case nor the second circuit case, the defendant cited even address that antecedent question of whether there was a conviction. And as we note in the smalls case, the second circuit has retreated from its holding. Third, I want to address this notion that somehow you have to infer at this junction that the, that shooting Mr. Mitchell in the face was somehow a mistake. Um, at paragraph 54, Mr. Mitchell, I don't think he's saying you have to infer it's a mistake. I think he's saying you didn't plead an intent to shoot at his head. Is that correct or not? So I think that paragraph 54 pretty clearly alleges that intent, right? We're not an officer's head. What does it say? So paragraph 54 says officers counted down and from 20 feet away, Mr. Mitchell could see them aiming at him. Now, at least at this initial stage, that's a, it's a fair inference to say they intended to shoot him in the face. It may turn out later, officers say, you know what? I tripped on my gun and I didn't actually mean to do that. Plead is intended to shoot at him. That's a little different than shooting at his face. Sure, Your Honor. And so again, you know, the injuries were serious to all parts of his body, right? So the legs and the back of the head injuries also resulted in permanent physical disability. So are there any cases that would establish that using a beanbag round is more than shooting at the person, um, is more than de minimis force? So again, Your Honor, I just want to be clear. At this preliminary stage, it's at least a fair inference in Mr. Mitchell's favor that they intended to aim at his face. The fact that they did hit him in the face, the fact that he saw them from 20 feet away taking aim, the fact that they were nearby and did so upon a countdown, I think are sufficient to at least drawing all inferences in our favor, say that they were intending to hit him in the face. Um, but to Your Honor's point, I think it's pretty clear, you know, that the more than de minimis force cases are things like a single punch, the use of pepper spray, three seconds of a taser. At the very least, even a beanbag round to the leg is on par with a punch, an armbar, or two to three seconds of a taser, all of which this court has said, uh, are not, uh, are more than de minimis uses of force that can't be used against a non-threatening, non-violent misdemeanant. Um, before I sit down, I just want to, uh, urge this court to reverse the district court, um, and at the very least, if you agree with us on the Heck bar issue, and we've given you at least three independent reasons why the, why Heck does not bar this, the claims in this case, this court should reverse and provide us with an opportunity to move for a leave to amend, since we weren't able to do that given the judgment issued the same day that the, that the dismissal order came in. Is there no further questions? Thank you, Your Honors.